32 F.3d 563
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Miguel CARDENAS, Defendant-Appellant.
 No. 93-5809.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 10, 1994.
Decided: August 15, 1994.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CR-93-47)
 Richard G. Bartmon, Boca Raton, Florida, for Appellant.
 John Kirk Brandfass, Assistant United States Attorney, Charleston, West Virginia, for Appellee.
 Jack T. Edmund, Bartlow, Florida, for Appellant.
 Charles T. Miller, First Assistant United States Attorney, Charleston, West Virginia, for Appellee.
 S.D.W.Va.
 AFFIRMED.
 Before WIDENER, HALL, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Miguel Cardenas (Cardenas) appeals his conviction and sentence for conspiracy to distribute marijuana, 21 U.S.C.Secs. 841(a)(1) and 846. For the reasons stated herein, we affirm.
 
 
 2
 * The evidence used to convict Cardenas came primarily from the testimony of Cardenas' two co-conspirators, Gordon Facemyer (Gordon) and his father James Facemyer (James).
 
 
 3
 In January 1992, Cardenas met Gordon in Florida and inquired whether Gordon was selling marijuana. After Gordon answered yes, Cardenas asked whether Gordon could sell ten to fifteen pounds of his marijuana. Gordon indicated he would, and the parties agreed that Cardenas would bring some marijuana the next day for Gordon to sample. The next day, Cardenas returned with a half ounce of marijuana, which Gordon smoked to ascertain the quality. After Gordon determined that the marijuana was acceptable, Cardenas promised to deliver a large quantity later that evening for Gordon to sell.
 
 
 4
 That evening, Cardenas delivered approximately twenty-four pounds of marijuana. Gordon testified that the marijuana was packaged in individual blocks, each weighing four to eight pounds. The blocks were wrapped in clear plastic. Gordon weighed each block to ascertain the total weight of the delivery. Thereafter, Cardenas and Gordon agreed to a price of approximately $1,400 per pound, with payment to be in two to three weeks, i.e., after James sold the marijuana in West Virginia. The next day, James drove to his and Gordon's home in Florida and transported the marijuana to Charleston, West Virginia where it was sold. After selling the marijuana, James returned to Florida with the proceeds from the drug sales. Gordon then paid Cardenas approximately $31,000.
 
 
 5
 On February 8, 1992, Gordon contacted Cardenas, informing him that he needed more marijuana to sell up "north." (J.A. 187). Cardenas responded, supplying Gordon with thirty-three pounds of marijuana wrapped in the same manner as the previous delivery. The subsequent events closely resembled the modus operandi of the prior transaction. Specifically, the parties agreed to a price of $1,400 per pound, with Cardenas to receive payment in two to three weeks, i.e., after the marijuana was sold in West Virginia. Gordon then contacted James, who drove from West Virginia to Florida to pick up the marijuana. James then returned to West Virginia where he sold the marijuana. After selling the marijuana, James forwarded the proceeds to Gordon in Florida, and Gordon paid Cardenas approximately $46,000.
 
 
 6
 In April 1992, Gordon and Cardenas participated in another transaction, using the same method of operation as before. Specifically, Gordon informed Cardenas that he needed more marijuana to sell in West Virginia. Cardenas arrived later the same day at the Facemyers' home in Florida with sixty pounds, packaged in small blocks of various weights and wrapped in clear plastic with newspaper surrounding the blocks. The parties again agreed to a price of $1,400 per pound, with payment to come in two to three weeks. Thereafter, James transported the marijuana to West Virginia for sale. After James sold the drugs, he brought the proceeds back to Florida, where Gordon paid Cardenas approximately $84,000.
 
 
 7
 Gordon's ex-wife, Donna Gail Hall (Hall), partially corroborated the testimony of Gordon and James with respect to this last transaction. Specifically, Hall testified that she assisted Gordon in counting the proceeds from the marijuana sales, part of which were for Cardenas. Hall also indicated that she witnessed Gordon pay Cardenas his share of these proceeds in April 1992 when Cardenas came to the Facemyers' home in Florida.
 
 
 8
 Later in the same month, Gordon and Cardenas conducted another transaction, with Cardenas delivering 165 pounds of marijuana for sale in West Virginia. Once again, the marijuana came in small blocks of various weights, wrapped in clear plastic and surrounded by newspaper. As before, Gordon promised to pay Cardenas in two to three weeks at a price of $1,400 per pound. After James sold the marijuana in West Virginia, Gordon paid Cardenas in Florida for part of the marijuana.
 
 
 9
 On June 9, 1992, Cardenas travelled to West Virginia to collect some of the money owed him by the Facemyers. Upon arriving, Cardenas contacted the Facemyers at James' trailer. Thereafter, the Facemyers collected $40,000 from the individuals selling marijuana for them and delivered the money to Cardenas at his motel room in Kanawha City, West Virginia. At the motel room, Cardenas asked the Facemyers to keep the money until he was ready to leave. On June 11, 1992, Cardenas came to James' trailer, collected his money and returned to Florida. At Cardenas' trial, the government introduced a motel receipt, revealing that Cardenas stayed at a Motel 6 in Kanawha City from June 7 to June 10, 1992.
 
 
 10
 On June 12, 1992, Gordon and James were arrested in West Virginia for distributing marijuana. At their arrest, the police confiscated 230 pounds of marijuana, some of which James testified was originally supplied by Cardenas. After being released on bond, Gordon returned to Florida, where he met Cardenas at a food store. During this meeting, Gordon informed Cardenas of his arrest and the confiscation of the marijuana. After Gordon told Cardenas that a family relative had video-taped the news report of his arrest, Cardenas asked for the tape so he could prove to "his people" that Gordon had in fact been arrested and was not simply trying to avoid paying for the last shipment.
 
 
 11
 After their arrest, Gordon and James agreed to assist law enforcement authorities in their continuing investigation into the Facemyers' suppliers. As part of their cooperation, James agreed to conduct an undercover purchase from Cardenas. Accordingly, on November 23, 1992, James met with several law enforcement authorities in Hardee County, Florida and was fitted with a transmitting device so the authorities could record the controlled purchase. Once fitted, James travelled to Cardenas' home, but Cardenas was not present. After speaking with Cardenas' wife, James returned to his own Florida residence.
 
 
 12
 That evening, Cardenas and another party arrived at James' residence in Florida. While wearing the transmitting device, James inquired about obtaining sixteen pounds of marijuana at the usual price. Cardenas indicated that he could supply the requested amount and it would be delivered that night. Later that evening, another individual returned to James' home with the marijuana. The marijuana was wrapped in sixteen one-pound plastic bags. The individual delivering the marijuana did not request and James did not offer to pay for the marijuana, suggesting that the parties agreed to the usual payment format, i.e., payment after James sold the marijuana in West Virginia. After receiving the marijuana, James turned it over to law enforcement officials.
 
 
 13
 In January 1993, Timothy Tucker, the law enforcement official in charge of investigating the Facemyers' drug conspiracy, prepared an affidavit describing this undercover purchase and the Facemyers' statements regarding their other dealings with Cardenas. This affidavit led to a warrant for Cardenas' arrest, which was subsequently executed.
 
 
 14
 On March 2, 1993, a grand jury in the Southern District of West Virginia returned a one count indictment, charging Cardenas with conspiracy to distribute marijuana, 21 U.S.C. Secs. 841(a)(1) and 846. The indictment charged that the conspiracy lasted from December 1991 until June 12, 1992. Trial on this charge was originally scheduled for May 26, 1993. At a pre-trial motion hearing on April 29, 1993, the district court gave the government a May 10, 1993 deadline for filing its notice of similar act evidence. The government did not file any such notice by this deadline.
 
 
 15
 On May 25, 1993, the day before the trial was scheduled to begin, the government revealed that the grand jury had returned a superseding indictment on that same day. This new indictment extended the date of the alleged conspiracy from June 12, 1992 to November 23, 1992. This extension thereby incorporated the last transaction between Cardenas and the Facemyers, in which government agents directed James to purchase sixteen pounds of marijuana from Cardenas in Florida. In light of this superseding indictment, the district court granted Cardenas' motion for a continuance of the trial, rescheduling the trial for June 28, 1993.
 
 
 16
 On June 15, 1993, a hearing was held concerning the scope of the conspiracy in the superseding indictment. During this hearing, the government argued that the November 23, 1992 marijuana transaction was part of the conspiracy described in both the original and superseding indictments. Thus, the government sought to introduce the evidence of this latter transaction as substantive evidence of the crime charged. In response, Cardenas argued that the November 23, 1992 marijuana transaction was not part of the same conspiracy that was alleged to exist between himself, the Facemyers, and others prior to the arrest of the Facemyers on June 12, 1992.
 
 
 17
 The district court agreed with Cardenas because the government had no proof that "a member of the conspiracy[other than Cardenas] can be linked to the November 23, 1992 event, as well as those that preceded it." (J.A. 30). Because there was no evidence suggesting that the marijuana for the November 1992 transaction was obtained from the same people who had supplied Cardenas for the prior transactions, the district court concluded:
 
 
 18
 It seems to me under those circumstances that one is dealing with two different conspiracies. The one that took place on November 23, 1992 does not appear to be the same as that conspiracy which took place from December 1991 to June 1992 as alleged in the original indictment. That being the case, it seems to me that the question remains is whether or not the government is going to proceed with the first conspiracy or the second conspiracy....
 
 
 19
 (J.A. 33).
 
 
 20
 In light of the district court's conclusion that two separate conspiracies were involved, the government could not introduce evidence of the November 23, 1992 transaction as substantive evidence of the first conspiracy. Accordingly, on June 23, 1993 the government filed a notice of similar act evidence, seeking to introduce the November 23, 1992 transaction under Fed.R.Evid. 404(b). Although the government filed this notice some forty-four days after the district court's original May 10 deadline, the government argued that it should be excused from this deadline because, prior to the hearing on June 15, 1993, it had sought to introduce this evidence as substantive evidence of the conspiracy charged in the superseding indictment. According to the government, it was only after the district court found that two conspiracies existed that the government was forced to rely on Fed.R.Evid. 404(b) as a method for admitting this evidence. In addition, the government argued that, because Cardenas was provided discovery material of the November 23, 1992 transaction in late April and early May 1993, Cardenas was not prejudiced by this late filing of the notice of similar act evidence. The district court deferred ruling on the admissibility of this evidence under Rule 404(b) until such time as the government sought to introduce it during the trial.
 
 
 21
 At trial, the government solicited testimony from both Facemyers regarding their transactions with Cardenas. On cross-examination, Cardenas' counsel explored the inconsistencies in Gordon's testimony regarding the amounts obtained from Cardenas. Specifically, Cardenas' counsel noted that, while Gordon's trial testimony suggested he obtained approximately 299 pounds of marijuana from Cardenas, his grand jury testimony indicated that Cardenas supplied only twenty pounds. Cardenas' counsel further noted that in a subsequent motion for reduction of his sentence, Gordon had claimed that his total involvement with marijuana was limited to five pounds. In addition, Cardenas' counsel established that Gordon was a heavy user of marijuana and received a reduced sentence due to his assistance in Cardenas' trial. Finally, Cardenas' counsel established that, even though Gordon testified to several dealings with Cardenas, Gordon did not know Cardenas' last name, referring to him as either "Mike" or "Big Mike." (J.A. 215, 273).
 
 
 22
 The cross-examination of James followed a similar path. Specifically, Cardenas' counsel questioned James regarding his marijuana sources, amounts of marijuana received, and amounts of money paid for the marijuana. Cardenas' counsel also established that James received a reduced sentence for his assistance in this trial. Finally, the cross-examination established that, even though James claimed he knew Cardenas for twenty years, he did not know Cardenas' last name.
 
 
 23
 Soon after the Facemyers' testimony, the government requested a sidebar to argue the admissibility of the November 23, 1992 transaction under Rule 404(b). During the sidebar, the government argued that the evidence of this transaction was admissible on several grounds. First, the government suggested that the subsequent transaction was relevant to show the "modus operandi of the conspiracy" in that the transaction mirrored in all respects the prior transactions during the December 1991 to June 1992 conspiracy; "that is, marijuana obtained by the defendant, fronted to the Facemyers with the anticipation of it being sold in West Virginia, with the proceeds then coming back to the defendant." (J.A. 342). Second, the government claimed that:
 
 
 24
 it would be a demonstration of prior drug dealing activity between the defendant and the Facemyers in that on the November 23, 1992 transaction, it can be discerned that negotiations are of such ease and back and forth conversation to demonstrate that the players, ... this defendant and the Facemyers, certainly knew each other and felt comfortable negotiating back and forth for marijuana that was in fact delivered later that day.
 
 
 25
 (J.A. 343).
 
 
 26
 The district court ruled that the evidence was admissible under Rule 404(b). The district court reasoned that "the similar act [evidence is] reasonably necessary in that the witnesses Gordon ... and James Facemyer are under heavy credibility attack by the defendant [and] the government's concern about the credibility attack is real." (J.A. 344). Thus, the district court found that the evidence regarding this transaction was relevant "on each of the grounds advanced by the government." (J.A. 345). Immediately preceding the admission of this evidence and again during its jury instructions, the district court gave the appropriate Rule 404(b) limiting instruction regarding this similar act evidence.
 
 
 27
 After trial, the jury found Cardenas guilty of the single count charged in the indictment. A presentence report (PSR) was prepared for Cardenas' sentencing. The PSR attributed 299 pounds of marijuana to Cardenas for purposes of determining his base offense level under the sentencing guidelines. U.S.S.G. Sec. 2D1.1 (c)(9). Cardenas filed an objection, challenging only the amount of marijuana attributable to him.
 
 
 28
 At the sentencing hearing, the district court overruled Cardenas' objection, concluding that the Facemyers' trial testimony supported a finding that 299 pounds were attributable to Cardenas. The district court then determined Cardenas' base offense level to be 26, his criminal history category I and his guideline imprisonment range to be 63-78 months.[1] The district court then sentenced Cardenas to sixty-three months' imprisonment, followed by a four-year term of supervised release and a $50 special assessment.
 
 
 29
 Cardenas appeals.
 
 II
 
 30
 Cardenas' most salient contention on appeal challenges the admissibility of the evidence relating to the November 23, 1992 transaction under Fed.R.Evid. 404(b). Cardenas offers two theories suggesting why evidence relating to this transaction was inadmissable. We find neither of Cardenas' arguments persuasive and discuss our reasoning with respect to each argument separately.
 
 
 31
 * Cardenas first contends that the evidence relating to the November 23, 1992 transaction was inadmissable under Rule 404(b). Cardenas reasons that the district court improperly found such evidence relevant to establish intent, knowledge and identity. We disagree.
 
 Fed.R.Evid. 404(b) provides:
 
 32
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.... Under this rule, similar bad acts are admissible if they are "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988) (footnotes omitted). In addition, the probative value of the evidence "must not be substantially outweighed by the danger of unfair prejudice." United States v. Bailey, 990 F.2d 119, 122 (4th Cir.1993). We review a district court's decision to admit such evidence for an abuse of discretion. United States v. Masters, 622 F.2d 83, 87 (4th Cir.1980).
 
 
 33
 In United States v. Mark, 943 F.2d 444 (4th Cir.1991), we addressed the admissability under Rule 404(b) of evidence relating to prior purchases of cocaine by a defendant who was charged with conspiracy to possess cocaine with intent to deliver. In that case, the indictment alleged that the defendant conspired with others to purchase cocaine from an undercover agent. The similar acts involved defendant's prior purchase of cocaine from another supplier. The district court allowed the government to introduce this evidence in its case-in-chief over the defendant's objection.
 
 
 34
 On appeal, we began our examination into the admissibility of the similar act evidence by noting that the "defendant's knowledge and intent are clearly elements which the prosecution must establish to prove a conspiracy...." Id. at 448. We added that the defendant had "clearly placed these elements directly in issue by his plea of not guilty." Id. Then, we concluded that the prior bad acts were admissible under Rule 404(b), reasoning that, because the acts were sufficiently related, "the relevance of the evidence derives from the defendant's having possessed the same state of mind in the commission of both the extrinsic act and the charged offense." Id.
 
 
 35
 We find the reasoning in Mark equally applicable to the present case. In the instant matter, the original conspiracy transactions and the extrinsic act are closely related. For example, in each instance the Facemyers obtained the marijuana from Cardenas in Florida without any payment. Instead, in each instance Cardenas anticipated payment after James sold the marijuana in West Virginia. Finally, Cardenas charged the same price for the marijuana in each transaction. When the extrinsic act evidence bears such close resemblance to the charged offense, "the relevance of the evidence derives from the defendant's having possessed the same state of mind in the commission of both the extrinsic act and the charged offense." Mark, 943 F.2d at 448. Thus, we conclude that the evidence relating to the November 23, 1992 transaction was relevant to establish Cardenas' intent and knowledge during the alleged conspiracy.
 
 
 36
 The only meaningful distinction between Mark and this case is that the similar act evidence in this case involves subsequent bad acts while Mark involved prior bad acts. However, this distinction does not render the similar act evidence inadmissible. We have consistently recognized that, under Rule 404(b), a court may admit subsequent bad acts to establish prior intent or knowledge. United States v. Hadaway, 681 F.2d 214, 217 (4th Cir.1982) ("subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion."). See also United States v. Whaley, 786 F.2d 1229, 1232 (4th Cir.1986); United States v. DiZenzo, 500 F.2d 263, 265 (4th Cir.1974). Thus, the subsequent transaction between Cardenas and James was relevant to establish Cardenas' prior intent.
 
 
 37
 Cardenas also contends that the similar act evidence was not "necessary" and, therefore, inadmissable under Rule 404(b). We disagree. This Court has noted that "evidence is necessary and admissible where it is an essential part of the crimes on trial ... or where it furnishes part of the context of the crime." Rawle, 845 F.2d at 1247 n. 4 (citations and quotations omitted). In addition, "necessity must be appraised in light of other evidence available to the government." DiZenzo, 500 F.2d at 266. Thus, when the evidence presented to the jury "generate[s] uncertainty about knowledge and intent, ... resort to ... other crimes evidence [may be] appropriate." Hadaway, 681 F.2d at 218.
 
 
 38
 As discussed, the similar act evidence in the present case established Cardenas' intent, an essential element of the conspiracy charge. Mark, 943 F.2d at 448. However, Cardenas' cross-examination of the government's key witnesses, the Facemyers, created a significant credibility issue, thereby "generat[ing] uncertainty about [Cardenas'] knowledge and intent." Hadaway, 681 F.2d at 218. Because, the subsequent transaction provided "more dependable proof of [Cardenas'] knowledge and intent, ... the evidence was ... reasonably necessary to the government's case." DiZenzo, 500 F.2d at 266.
 
 
 39
 In addition, the evidence relating to this subsequent transaction was necessary to establish the identity of the Facemyers' supplier. Specifically, the cross-examination of Gordon and James "generated uncertainty about" the identity of the Facemyers' supplier during the alleged conspiracy, given that they only knew him as "Mike" or "Big Mike" despite a lengthy relationship. Hadaway, 681 F.2d at 218. The tape recording of the subsequent transaction provided "more dependable proof" of Cardenas' identity as the individual with whom the Facemyers were dealing.[2]
 
 
 40
 Finally, Cardenas contends that the probative value of this evidence was substantially outweighed by the likelihood of its unfair prejudice. In support, Cardenas points to the fact that, during jury deliberations, two of the three jury questions concerned the evidence relating to the November 23, 1992 transaction. According to Cardenas, "these circumstances make it apparent that the jury's guilty verdict was considerably based on a focus upon the 'other crimes' evidence." (Brief of Appellant 30). Because of this unfair prejudice, Cardenas concludes that the evidence was inadmissable. We disagree.
 
 
 41
 "The prejudice which the rule is designed to prevent is jury emotionalism or irrationality." United States v. Greenwood, 796 F.2d 49, 53 (4th Cir.1986). Thus, a court should exclude evidence "when there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and ... this risk is disproportionate to the probative value of the proffered evidence." United States v. Hernandez, 975 F.2d 1035, 1041 (4th Cir.1992) (quotation omitted).
 
 
 42
 In the present case, the evidence was probative to establish Cardenas' identity and requisite intent. Although relevant evidence is always prejudicial, in this case it did not "create the impression that [Cardenas] was an ogre who should be sent to jail, guilty or not." Hadaway, 681 F.2d at 219. In addition, any potential prejudice resulting from this evidence was limited as a result of the district court's limiting instructions. Under such circumstances, we cannot conclude that the district court abused its discretion by admitting the similar act evidence.
 
 B
 
 43
 Cardenas next contends that the government's tardiness in filing its notice of similar act evidence required the district court to exclude the evidence relating to the November 23, 1992 transaction. Specifically, Cardenas notes that the district court originally required the government to file its notice of similar act evidence by May 10, 1993. Because the government filed this notice forty-four days after this deadline, Cardenas concludes that the district court should have excluded this evidence. We disagree.
 
 
 44
 Rule 404(b) requires the prosecution in a criminal case to "provide reasonable notice in advance of trial ... of the general nature of any [similar act] evidence it intends to introduce at trial." The notice provided by the government in this case undeniably qualifies as reasonable. As the factual discussion reveals, the government originally sought to introduce evidence relating to the November 23, 1992 transaction as substantive proof of the conspiracy. The government believed this transaction, as well as the previous ones between Cardenas and the Facemyers, comprised one single conspiracy. It was not until the district court found that the November 1992 transaction was a separate conspiracy that the government was forced to rely on Fed.R.Evid. 404(b) as the mechanism for admitting evidence relating to this transaction.
 
 
 45
 Moreover, Cardenas failed to identify any prejudice resulting from the government's failure to file the notice of similar act evidence within the district court's deadline. For example, Cardenas does not suggest that this late filing caused any surprise on his behalf. Indeed, Cardenas could not legitimately argue surprise because the government provided Cardenas with discovery material relating to this transaction in late April and early May, 1993. Under these circumstances, we conclude that the government's tardiness in filing its notice of similar act evidence does not warrant reversal.
 
 III
 
 46
 At sentencing, the district court attributed 299 pounds of marijuana to Cardenas, resulting in a total offense level of 26. See United States Sentencing Commission, Guidelines Manual,Sec. 2D1.1(c)(9) (Nov.1992). Cardenas complains that the district court's attribution of this amount of marijuana to him was clearly erroneous.
 
 
 47
 The quantity of drugs in a drug offense largely determines the calculation of the sentencing range under the sentencing guidelines. See U.S.S.G. Sec. 2D1.1(c). In arriving at the proper drug quantity, the sentencing guidelines direct the sentencing court to consider "all such acts and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(1). In addition, U.S.S.G. Sec. 1B1.3(a)(2) provides that, when considering offenses which would require grouping of multiple counts under the aggregation principles of U.S.S.G. Sec. 3D1.2(d), the sentencing court should consider all acts of the defendant that "were part of the same course of conduct or common scheme or plan as the offense of conviction." Application Note 3 to U.S.S.G.Sec. 1B1.3 further teaches us that application of subsection (a)(2), which references the types of offenses described in U.S.S.G. Sec. 3D1.2(d), does not require the defendant to have been convicted of multiple counts.
 
 
 48
 When an issue regarding the amount of drugs attributable to a particular defendant is properly raised, the sentencing court must make an independent resolution of this factual issue at sentencing. U.S.S.G. Sec. 6A1.3(b), p.s.; United States v. Morgan, 942 F.2d 243, 245 (4th Cir.1991). Because the quantity of drugs goes to the question of sentence rather than guilt, the government need only prove the quantity by a preponderance of the evidence. Mark, 943 F.2d at 450. Substantial deference is accorded to the district court's factual findings on the amount of drugs involved. United States v. Brooks, 957 F.2d 1138, 1148 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992). Thus, the district court's finding as to the quantity of drugs attributable to a defendant is reviewed only for clear error. United States v. Williams, 986 F.2d 86, 90 (4th Cir.), cert. denied, 113 S.Ct. 3013 (1993).
 
 
 49
 In this case, the district court articulated a specific basis for attributing the 299 pounds of marijuana to Cardenas for sentencing purposes--the trial testimony of Gordon and James as summarized in the PSR. Gordon testified as to the precise amount of drugs purchased from Cardenas on five different occasions: twenty-four pounds in January 1992; thirty-three pounds in February 1992; sixty pounds in April 1992; 165 pounds later in April 1992; and sixteen pounds in November 1992.[3] This testimony was consistent on both direct and cross-examination. Furthermore, Gordon testified that he weighed the amounts of marijuana purchased from Cardenas on each separate transaction. James corroborated Gordon during his own testimony, stating that he picked up twenty-four pounds from Gordon in January 1992; approximately thirty-four pounds in February 1992; sixty pounds in April 1992; 165 pounds later in April 1992; and that he bought sixteen pounds from Cardenas in November 1992. In light of this evidence, we cannot conclude that the district court's finding on this score is clearly erroneous.
 
 
 50
 Cardenas argues that the district court improperly relied on the testimony of Gordon and James because their testimony as to the amount of marijuana purchased from Cardenas and amount of money paid to Cardenas was inconsistent with their prior statements, thereby rending their testimony inherently unreliable.[4] Though some trial testimony was inconsistent with prior statements, the district court was clearly entitled to rely on the Facemyers' testimony as to the quantity of marijuana because their testimony had " 'sufficient indicia of reliability to support its probable accuracy.' " U.S.S.G. Sec. 6A1.3; see also United States v. Hicks, 948 F.2d 877, 883 (4th Cir.1991) (due process requirements are satisfied where evidence relied upon by district court has "some minimal indicium of reliability beyond mere allegation" (citations and internal quotes omitted)).
 
 IV
 
 51
 Cardenas raises several other assignments of error, which he contends should be resolved in his favor. We have reviewed each of the other assignments of error and conclude that each is without merit. Accordingly, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 No adjustments were made to Cardenas' base offense level. Therefore, his total offense level was also 26
 
 
 [2]
 Cardenas does not contest the third prong of the Rule 404(b) inquiry, i.e., the reliability of the similar act evidence. Given the fact that this evidence consisted of a tape recording which the district court found legible, we conclude that such evidence was reliable
 
 
 [3]
 Notably, the total weight of the marijuana to which Gordon testified adds up to only 298 pounds, one pound less than that which the district court found attributable to Cardenas. Fortunately, this discrepancy does not affect Cardenas' sentence.Under U.S.S.G. Sec. 2D1.1(c)(9), Cardenas would have received the same sentence if the total marijuana attributable to him ranged from 100 kilograms to 400 kilograms (220 pounds to 880 pounds)
 Moreover, we note that the district court properly attributed the quantities from all five transactions to Cardenas. The first four of these transactions, which occurred during the course of the conspiracy, are relevant conduct under U.S.S.G. Sec. 1B1.3(a)(1). Though not part of the conspiracy as found by the district court, the fifth transaction is obviously relevant conduct under U.S.S.G. Sec. 1B1.3(a)(2). Further, even if the sixteen pounds from the November 1992 transaction was not properly attributable to Cardenas, such an error would not affect his sentence since the total amount would still fall within the range prescribed by U.S.S.G. Sec. 2D1.1(c)(9).
 
 
 [4]
 For example, before the grand jury, Gordon testified that he purchased a total of twenty pounds from Cardenas. In a subsequent motion for reduction of his sentence, Gordon claimed that his total involvement with marijuana was five pounds. Finally, during Cardenas' trial, Gordon testified that he and James made five separate purchases of marijuana from Cardenas for a total of 299 pounds. James' trial testimony regarding the dollar amounts paid to Cardenas also conflicted with his prior statements to law enforcement officials