**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenneth E. BAILEY, Defendant–**
**Appellant.**

**No. 92–5325.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 1, 1992.

Decided March 22, 1993.

Charles H. Williams, II, argued (C. Bradley Hutto, on brief), Williams & Williams, Orangeburg, SC, for appellant.

John Steven Simmons, U.S. Atty., Columbia, SC, argued (John W. McIntosh, First Asst. U.S. Atty., on brief), for appellee.

Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MORGAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

CHAPMAN, Senior Circuit Judge:

Kenneth E. Bailey was convicted of conspiracy to violate the Hobbs Act, Title 18 U.S.C. § 1951, and of attempting to violate the same act. These convictions resulted from a monetary payment made to Bailey by Ronald L. Cobb. At the time the payment was made, Bailey was a member of the South Carolina House of Representatives and Cobb was acting as a paid confidential informant for the FBI, which was investigating alleged corruption in the South Carolina General Assembly. Bailey appeals his convictions and claims (1) that evidence of other crimes was improperly admitted under Federal Rule of Evidence 404(b) although such evidence was "blatantly unreliable," (2) that the prosecution of the appellant under the Hobbs Act violated the Tenth Amendment to the United States Constitution, and (3) that there was not sufficient evidence of interference with interstate commerce to sustain Bailey's conviction under the Hobbs Act. We find no merit to these exceptions, and we affirm.

## I.

This is another appeal arising out of "Operation Lost Trust," which was the code name given to the investigation of the South Carolina General Assembly by the FBI. In its investigation, the FBI used Ronald L. Cobb, a former member of the South Carolina House of Representatives, as a confidential informant. Cobb, a registered lobbyist, was snared by the FBI in May 1987 when he agreed to invest $20,000 toward the purchase of a kilogram of cocaine. Thereafter, he agreed to cooperate with the FBI and was used during the 1990 term of the General Assembly as the primary contact with members of the South Carolina legislature during Operation Lost Trust.

During the 1990 term House Bill H. 3796 was pending, which provided for the holding of a referendum on the issue of whether to legalize pari-mutuel betting on horse and dog racing within the state. Cobb pretended to be a lobbyist for Alpha Group, a fictitious company, interested in passage of H. 3796. Cobb was provided an office at the AT & T Building across the street from the South Carolina State House and a suite at the Town House Motel, an establishment frequented by members of the General Assembly. The office and suite were both under video and audio surveillance. Cobb provided an audio body recorder with which he recorded sessions with members of the General Assembly at other places.

The FBI instructed Cobb to approach only individuals with whom he had previously done illegal business. Cobb approached member Luther Taylor who agreed to approach other members of the General Assembly to determine if they would support the pari-mutuel bill in exchange for financial remuneration from Cobb. Taylor approached Representative Frank McBride, who on April 10, 1990 met with Cobb in the AT & T Building office and accepted $1,000 in exchange for his vote and support of the pari-mutuel bill. McBride agreed to try to recruit others into a core group to support H. 3796. Shortly thereafter, McBride spoke with defendant Bailey and advised him of the payment made by Cobb and that money was probably available to Bailey if he were interested.

On April 25, 1990, the core group, including defendant Bailey, attempted to adjourn debate on all bills preceding the pari-mutuel bill on the contested calendar so as to bring the pari-mutuel bill to a vote. This attempt was unsuccessful, but Cobb paid some of the core group $300 for their effort in attempting to force the vote. McBride advised the defendant of these payments, and on May 9, 1990, defendant Bailey met with Cobb in the lobby of the State House and Bailey advised Cobb that he had heard that Cobb was paying for support of H. 3796. Cobb agreed to meet Bailey later that day at his office. Later on the same morning, Bailey and Cobb met in Cobb's office in the AT & T Building and discussed the pari-mutuel bill and the strategy for moving the bill along. Defendant agreed to help and Cobb asked him to come back later that afternoon to be paid. On the afternoon of May 9, 1990, Bailey returned to Cobb's office and was paid $500 in cash for his support. A video tape of this transaction was introduced into evidence.

On July 18, 1990, the FBI served subpoenas on all of the targets of Operation Lost Trust and left word with defendant's office that the FBI was looking for him. Bailey called the FBI around noon and was notified that Special Agent Philip Goodwin needed to speak with him. Later the same day, Bailey filed an amended campaign disclosure form in which he listed a previously unitemized $450 contribution as having come from the "Alpha Group." When interviewed by the FBI, Bailey admitted receiving $450 from Cobb and stated that it was a campaign contribution.

At trial, over the objection of the defendant, the government presented the testimony of a former Charleston County representative, Robert Kohn, to the effect that he had paid $200 to the defendant as a result of the defendant's agreement to assist in having about one-half mile of dirt road located in Orangeburg County paved. Kohn was acting on behalf of the owner of

a boat company, which needed the road paved to service certain billboard signs it wished to erect near Interstate Highway 26. The trial judge admitted this testimony under Federal Rule of Evidence 404(b) after it heard and considered lengthy arguments from each side as to its admissibility and possible prejudice and after the court had given the jury a limiting instruction as to the proper consideration of such evidence. The $200 received from Kohn was not reported by Bailey on his campaign disclosure form.

## II.

■ The admission of evidence, including such as may be offered under Federal Rule of Evidence 404(b), is committed to the discretion of the trial court, and its action will not be overturned on appeal unless its decision is shown to be arbitrary or irrational. *United States v. Haney*, 914 F.2d 602, 607 (4th Cir.1990). Rule 404(b) prohibits the admission of "other crimes" evidence solely for the purpose of establishing a defendant's bad character. However, such evidence may be admitted for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

■ When such evidence is found to be relevant, a defendant may challenge its admission under Federal Rule of Evidence 403 upon a showing that the evidence is more prejudicial than probative. We have held that Rule 404(b) is an inclusionary and not an exclusionary rule. Specifically, this court has stated:

It has been said that such "undue prejudice would seem to require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." Such prejudice, if any, can be generally obviated by a cautionary or limiting instruction, particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt. But the crit-

ical question of whether the probative value of the testimony is disproportionately prejudicial to the defendant and, if so, whether it can be adequately moderated by cautionary instructions is one committed to the discretion of the district court. . . .

*United States v. Masters*, 622 F.2d 83, 87 (4th Cir.1980) (citation omitted).

■ In *United States v. Rawle*, 845 F.2d 1244 (4th Cir.1988), we established a four-prong test to be applied to 404(b) evidence. First, the evidence must be relevant to an issue other than character; second, the evidence must be necessary to prove an element of the crime on trial; third, the evidence must be reliable, and fourth, applying Rule 403 the evidence, although relevant, must not be substantially outweighed by the danger of unfair prejudice. *Id.* at 1247.

Although the appellant attacks the testimony of Kohn under all prongs of *Rawle*, he expends most of his time and energy on the claim that the evidence is unreliable. Bailey argues that the evidence was unreliable because (1) Kohn was an admitted scoundrel and con artist; (2) he was involved in a drug deal with Ron Cobb while Cobb was acting under cover for the FBI; (3) Kohn pled guilty to one count of conspiracy under the Hobbs Act in exchange for immunity from all other crimes; (4) Kohn expected a recommendation for a reduced sentence from the government if he provided substantial assistance in the trial of other Lost Trust cases; (5) Kohn had no useful knowledge relating to Bailey's support of the pari-mutuel bill; and (6) Kohn made sure that rebuttal was impossible, because no one could corroborate his story and no one could contradict it.

Kohn testified that he gave Bailey the $200 while they were alone in the parking garage of the State House, that he had obtained the money from his constituent, a boat company official, and that the payment was in exchange for Bailey's assistance in having the dirt road paved to service the boat company's billboards.

Bailey argues that Kohn is a liar, that he had a good reason to lie and that the government had a duty to corroborate Kohn's testimony before it could pass the reliability prong of *Rawle.* Reliability is not synonymous with credibility when dealing with 404(b) evidence. The trial judge correctly observed that it was for the jury to determine if Kohn was telling the truth about the $200 payment to Bailey. Of course, if proposed 404(b) evidence is so preposterous that it could not be believed by a rational and properly instructed juror, it would be the trial judge's duty to deny its admission. However, we do not have such a case before us. Kohn's reputation, character and past acts were explored on cross examination and his credibility was before the jury. Testimony is not unreliable simply because it is in conflict with or contradicted by other testimony. Nor is it unreliable because the witness has an unsavory past. These are merely circumstances for the jury to consider.

The appellant challenges the reliability of Kohn's testimony because of Kohn's plea bargain. A defendant has the right, and his attorney in this case was vigorous in executing this right, to attack the credibility of a government's witness because of the witness's plea bargain. There are the usual claims that such a witness may shade his testimony or exaggerate what he knows in order to curry favor with the prosecutor in the hope of obtaining a favorable recommendation that will reduce his sentence. A jury is free to agree with this argument and disbelieve the testimony of the plea bargainer, but the plea bargain itself does not make 404(b) evidence unreliable. There are two sides to the plea bargain argument and its effect on reliability. In addition, as we stated in *United States v. Hadaway,* 681 F.2d 214 (4th Cir.1982):

"The reliability of the evidence is also sufficient. While the witnesses had undertaken by plea agreements to cooperate with the government, at least two different persons testified to each of the three other crimes. Furthermore, while a defendant is always at liberty to cast aspersions on the testimony of a plea bargainer as unfairly favoring the government to provide a *quid pro quo* for the bargain, there is the countervailing consideration that self-exposure to a perjury charge is unlikely. The plea bargainer's position frequently makes him extremely reluctant to commit another crime or crimes and thus lay himself open to greater punishment.

*Id.* at 218.

Courts have held that corroboration of 404(b) evidence of other crimes is not required. *United States v. Leisure,* 807 F.2d 143, 145 (8th Cir.1986); *United States v. Gilmore,* 730 F.2d 550, 554 (8th Cir. 1984). Kohn's testimony, however, was corroborated by the testimony of former representative Frank McBride. McBride had also been caught by "Operation Lost Trust" and had entered into a plea bargain with the government, which required him to testify truthfully as to what he knew about other legislators' involvement with Ron Cobb and the pari-mutuel betting bill. Therefore, his testimony was subject to the attack that he too was currying favor with the prosecution. However, he did testify that Bailey had told him that Kohn had asked Bailey to assist in getting a dirt road paved in Orangeburg County to service a billboard on I–26 and that he (Bailey) was to be paid for so doing.

The trial judge concluded that Kohn's testimony was reliable. We find that the trial judge did not err in this finding.

Evidence of other crimes must be relevant to some issue other than the defendant's character, and it must be relevant to the issue for which it is offered. The appellant's plea of not guilty placed in issue all elements of the crimes for which he was charged, including the element of intent. However, this does not throw open the door to any sort of other crimes evidence, and we made this clear in *United States v. Hernandez,* 975 F.2d 1035 (4th Cir.1992), when we stated:

It is a truism that a plea of "not guilty" to a charge requiring intent places that mental state in issue and that the state may offer evidence of other bad

acts to address that issue. [*U.S. v.] Mark*, 943 F.2d at [444] 448 [4th Cir. 1991]; *United States v. Di Zenzo*, 500 F.2d 263, 265 (4th Cir.1974). This principle, however, does not permit any sort of uncharged bad act to be brought to bear against defendants charged with intentional crimes. Most crimes involve some level of intent, but all evidence of other intentional acts or crimes does not for this reason become relevant. Evidence to show intent is not admissible when the unrelated bad act is "tenuous and remote in time from the charges in the indictment." *United States v. Cole*, 491 F.2d 1276, 1279 (4th Cir.1974). For example, evidence of a prior stabbing by the defendant is not relevant to show intent in a later encounter with a different victim when the defendant admitted stabbing the victim but pleaded self-defense. *United States v. Sanders*, 964 F.2d 295, 298–99 (4th Cir.1992).

A plausible interpretation of the rule holds that evidence of other crimes may not be offered when the defendant unequivocally denies committing the acts charged in the indictment. *See United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir.1988). This circuit has no similar precept. Our cases examine the use for which intent evidence is offered in each instance, following the admonition that "the rule and the exceptions should be considered with meticulous regard to the facts of each case." *United States v. Baldivid*, 465 F.2d 1277, 1290 (4th Cir. 1972) (Sobeloff, J., concurring in part and dissenting in part). We have admitted evidence of other acts on the issue of intent, for example, where the defendant claimed that "he was present but innocent" during the sale of the drugs, and he elicited false testimony that he had no prior involvement in any cocaine transaction, *United States v. Rhodes*, 779 F.2d 1019, 1030–31 (4th Cir.1985); where the defendant contended he had merely obtained a truck for friends without knowing it would be used to transport stolen property, *Hadaway*, 681 F.2d at 217; where intent was a "key issue" because the defendant was "sharply contesting the sufficiency of the government's proof

of lascivious intent" in a child-molestation case, *United States v. Beahm*, 664 F.2d 414, 417 (4th Cir.1981); and where the defendant has sought "to depict herself as one whose essential philosophy and habitual conduct in life is completely at odds with the possession of a state of mind requisite to guilt of the offense charged...." *United States v. Johnson*, 634 F.2d 735, 737 (4th Cir.1980). *Id.* at 1039–40.

The 404(b) evidence of Kohn's payment of $200 to Bailey was closely related in time because it was during the same legislative term. It is not tenuous to the charges in the indictment because it involved the acceptance of money for the use of his political office. Also, Bailey admitted taking money from Cobb but contended it was a campaign contribution and not a bribe. This contention made his intent in accepting the money the primary issue for the jury to decide. The government was required to prove Bailey's intent was to treat the money as a payment for his assistance to Cobb in supporting and moving along the pari-mutuel betting bill. The evidence of a prior similar act of accepting money for his actions as a legislator was admissible to show intent and absence of mistake. *United States v. Greenwood*, 796 F.2d 49, 53 (4th Cir.1986).

The same reasoning is applicable to the *Rawle* prong that requires 404(b) evidence to be necessary to prove an element of the crime. Bailey's intent in accepting the money was the crux of the case, and the government was required to prove beyond a reasonable doubt that Bailey intended to accept the money as a bribe or in payment for his legislative services in order to secure a conviction. Bailey's prior act of taking money in exchange for the services of his office was necessary to counter his claim of lack of intent and that the money was a campaign contribution.

The trial judge weighed the effect of admitting the testimony as required by Rule 403, and concluded that its probative value outweighed the danger of unfair prejudice, confusion or misleading the jury. We find no abuse of discretion in this con-

clusion. The testimony of Kohn was simple and straightforward. It was not the sort which excites emotionalism in a jury so as to lead it to an irrational verdict. Kohn's testimony was also put in proper prospective by the limiting charge given by the trial judge. We find no abuse of discretion in the admission of Kohn's testimony.

### III.

Appellant challenges the jurisdiction of the federal courts to try him on a Hobbs Act charge, because he claims that his alleged offense did not have an adverse effect on interstate commerce. He claims that interference with interstate commerce means, by inference, an act that obstructs, delays or has a negative impact. The Supreme Court stated in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960):

> [T]here are two essential elements of the Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.

*Id.* at 218, 80 S.Ct. at 274.

Bailey argues that the evidence in the present case established that, if the parimutuel bill had become law, it would not have obstructed or adversely affected commerce, but would have had a very positive impact on such commerce by the creation of jobs, the construction of race tracks, and the increase in tourism.

In support of this argument to require an adverse effect, appellant relies upon a statement appearing in *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir.1990), which states that one of the essential elements in a Hobbs Act prosecution is "(3) that the coercion occurred in such a way as to affect adversely interstate commerce." This is a direct quote from *United States v. De Parias*, 805 F.2d 1447, 1450 (11th Cir. 1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Appellant

reads the language of the Act too narrowly and the holdings in *Buffey* and *De Parias* too broadly. Neither case addresses the question of whether an adverse effect on interstate commerce is an essential element of the crime. Each case dealt with the jurisdictional requirement that there must be an effect on commerce and held that the attempted blackmail in *Buffey* and the kidnapping in *De Parias* satisfied this jurisdictional requirement.

■ In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Court made clear that the Hobbs Act is not to be narrowly applied. "That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Id.* at 215, 80 S.Ct. at 272.

■ A requirement that the effect on interstate commerce must be adverse is without support and is contrary to many cases that have found the jurisdictional requirement satisfied upon a threatened effect. *United States v. Staszcuk*, 517 F.2d 53, 60 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (a potential or realistic possibility of an effect); *United States v. De Met*, 486 F.2d 816, 822 (7th Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (an arguably *de minimis* effect); *United States v. Curcio*, 759 F.2d 237, 241–42 (2d Cir.), *cert. denied*, 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 117 (1985) (a potential or subtle impact); *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 52 L.Ed.2d 1093 (1977) (a reasonably probable effect on commerce). In addition, this court has stated that the jurisdictional predicate of the Act "may be satisfied though the impact upon commerce is small, and it may be shown by proof of probabilities without evidence that any particular commercial movements were affected." *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir.1985), *cert. denied*, 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986).

Although the word "adverse" has been loosely used in expressing the effect on interstate commerce, such adverse effect is not an essential element of the crime that must be proved by the prosecution in a Hobbs Act case.

Bailey also argues that there was no proof that his extortionate act was related to interstate commerce. He argues that for all practical purposes the pari-mutuel betting bill was dead for the 1990 legislative session at the time Bailey received the payment from Cobb. Bailey contends that the possibility of resurrecting the bill was nil, and therefore any payment to him on May 9, 1990 could not have affected the passage of the bill or interstate commerce.

It is not necessary that Bailey's vote and Cobb's payment to him be simultaneous in order for such payment to qualify as being obtained "under color of official right." The record reflects that Bailey knew in April 1990 that Cobb was paying representatives for their support of the pari-mutuel bill, and he was advised by McBride that money was probably available for him if he had an interest. McBride and Bailey actually sought unsuccessfully to find Cobb in the State House in late April 1990 about the time that the effort was made to adjourn debate on all bills preceding the pari-mutuel bill so as to force the House of Representatives to vote on the bill. Although this occurred approximately two weeks before the cash payment was made by Cobb to Bailey, Cobb testified that when he paid Bailey they discussed the pari-mutuel bill and the strategy for moving the immediate effort to pass the bill to the Senate. Furthermore, at the time the payment was made, Bailey also agreed to approach legislator John Matthews and seek his support for the bill. The jury could conclude from this testimony that the payment was made and received because of Bailey's past support and continuing support of the pari-mutuel betting bill.

We find no merit to appellant's claim that there was insufficient evidence of an effect on interstate commerce. The evidence presented on this issue was basically the same as that presented by the prosecution in *United States v. Taylor*, 966 F.2d 830 (4th Cir.1992), which we found to be sufficient.

## IV.

■■■■ Appellant argues that the prosecution by the federal government of a member of the South Carolina House of Representatives because of his actions, taken in connection with a pending bill, violates the letter and the spirit of the Tenth Amendment to the Constitution of the United States, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Bailey contends that the federal government's sting operation "Operation Lost Trust" invaded the rights of the State because South Carolina has the right to regulate gambling within its borders.

We find no merit to this claim. The Hobbs Act is a well recognized federal statute, and the Tenth Amendment does not prohibit the federal government from enforcing its laws, even when there are state laws addressing the same criminal act.

"Operation Lost Trust" did not interfere with the legitimate legislative process of the State of South Carolina. It was directed solely at the dishonest acts of some of the members of the State's General Assembly. This is not a violation of the Tenth Amendment. The investigation and subsequent prosecutions did not contravene some power specifically reserved to the State by the Constitution of the United States. The right to control commerce between the states is a power given exclusively to the federal government under Article 1, Section 8 of the Constitution.

Although South Carolina could have brought state criminal charges against Bailey based upon the same facts, this does not prevent the United States from enforcing its criminal statutes. *United States v. Santoni*, 585 F.2d 667, 672 (4th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979); *United States v. Cul-*

*bert,* 435 U.S. 371, 379–80, 98 S.Ct. 1112, 1116–17, 55 L.Ed.2d 349 (1978).

For the foregoing reasons, we confirm the convictions and the sentence of the appellant.

*AFFIRMED.*