**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Toy Burton MADDEN, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Toy Burton MADDEN, Defendant–
Appellant.**

Nos. 93–5472, 93–5606.

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1994.

Decided Oct. 31, 1994.

**ARGUED:** Andrew Lee, III, Silver Springs, MD, for appellant. Joyce Kallam McDonald, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for appellee.

Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and BUTZNER, Senior Circuit Judge.

Vacated and remanded by published opinion. Chief Judge ERVIN wrote the majority opinion, in which Senior Judge BUTZNER joined. Judge WILKINS wrote a dissenting opinion.

## OPINION

ERVIN, Chief Judge:

Toy Madden was indicted on four counts of bank robbery in violation of 18 U.S.C. § 2113(a). The counts were severed for trial, and Madden was convicted on Count I of the indictment, after which the government dismissed the remaining counts. Madden subsequently was sentenced to 240 months imprisonment. Jurisdiction in the district court was proper under 18 U.S.C. § 3231. Madden now appeals, asserting that the evidence was insufficient to support his conviction and that the prosecution improperly introduced evidence of drug use in violation of Federal Rule of Evidence 404(b). Jurisdiction in this court is proper under 28 U.S.C. § 1291. While we believe that the evidence was sufficient to support the conviction, we agree with Madden that the evidence of drug use in this instance was in error, and that the error here was not harmless. We thus vacate and remand for a new trial.

I.

On November 4, 1992, an individual wearing sunglasses and a hooded sweatshirt with the hood over his head entered a branch of the Maryland National Bank located in the Rotunda shopping mall at 711 West 40th Street in Baltimore and stood in line. When his turn came, the robber went to a teller station staffed by Shari Meade and presented to her a note, which stated:

This is a hold up! I do have a gun!

No Marked Bills

No dye packs, and you live.

Put money in an envelope

$20.00s

$100.00s

$50.00s

The robber was described by the teller as a black male, about 25 to 30 years of age, well built and dark complexioned. J.A. 25–26. The teller gave the robber $4,501 and he left the bank, leaving the demand note behind. He left no fingerprints. J.A. 84.

The reverse side of the demand note turned out to be a company memorandum to all employees of Fire Mak Sprinkler, informing them of a mandatory staff meeting. The memorandum was signed by "Kenneth Smith, Jr. Construction Manager." From Mr. Smith, investigators learned that the memo had been included in paycheck envelopes to all employees around September 28, 1992. Four Fire Mak employees were absent from work on the day of the Rotunda bank robbery, including two African–American employees. One of the two was Madden, who had called in with truck problems that morning. Eventually, Madden's photo was placed in a photo array for Ms. Meade who, while expressing some uncertainty, by process of elimination picked Madden's photo out of the group.

The United States obtained an initial indictment against Madden on a different bank robbery that occurred on December 7, 1992. Subsequently, a superseding indictment issued charging Madden with four separate robberies, each against different branches of the Maryland National Bank, occurring on November 4 and December 7, 1992, and January 4 and January 26, 1993. Although the indictments named Madden alone, apparently he recruited the assistance of Michael Burley for the second robbery. Burley was indicted separately on a number of counts and eventually entered into a plea agreement with the United States, as part of which he was required to testify against Madden. His testimony was central to the Madden prosecution.

Although Burley was not the most cooperative or expressive witness, either intentionally or not, he was certainly the most damning to Madden. He testified that he had known Madden since childhood and that they lived across the street from each other in Baltimore. Burley related that, while sitting in Madden's truck during late 1992, Madden had told him about the robbery of the Rotunda mall branch of the Maryland National Bank. Madden related to Burley that he was surprised at how easy the bank robbery was, how quickly the police helicopter had responded after the robbery, and how quickly he had been able to get to his truck. Madden told Burley that it was easy because he just went in and gave the teller the note. He said that the teller then gave him some money, and he just walked out and got into his truck in a parking lot across from a police station. He also instructed Burley that in performing a bank robbery, Burley should put the amounts demanded on the note, stating that Burley should request hundreds, fifties and twenties. Madden also told Burley that Madden had worn a hooded sweatshirt and sunglasses during the Rotunda robbery that he had later thrown away, and that they were a good disguise to wear while robbing a bank. Madden also told Burley that he should put clear fingernail polish on his fingertips, to avoid leaving prints, and that he should open doors using his knuckles for the same reason.

Before Burley gave this testimony, however, the prosecutor established Burley's relationship to Madden, and relied largely on their shared experience using drugs.[1] Burley related at trial that he and Madden had used drugs together at the home of a neighbor, Keith Jones.

Q. Now, during the fall of 1992, you stated that you were using drugs; is that correct?

A. Yes.

Q. And which drugs, Mr. Burley?

A. Cocaine and heroin.

Q. And did you ever have the occasion to use drugs with anyone else?

A. Yes.

---

1. Initially, the district court refused to allow testimony regarding Madden's drug use. J.A. 19. Following briefing by the government, however, it reversed this ruling. J.A. 68–70.

Q. And can you tell the Court who?

A. A lot of people.

\* \* \* \* \* \*

Q. And was Mr. Madden ever one of those persons?

A. Yes.

Q. Did Mr. Madden use drugs in your presence?

A. Yes.

Q. And what kind of drugs was Mr. Madden using?

A. Cocaine.

Q. And how was he ingesting the cocaine?

A. Snorting it.

Q. Did he ever use any other drugs that you were aware of?

A. Heroin.

Q. And how did he ingest the heroin?

A. Through his nose.

Q. Did Mr. Madden ever share drugs with you?

A. Sometimes.

Q. And did you ever share drugs with Mr. Madden?

A. Yes.

Q. Now, when you used drugs in Mr. Madden's presence, where were you?

A. Next door.

Q. And where is next door?

A. Keith grandmother's house.

Q. Keith Jones's grandmother's house?

A. Yes.

Q. And that was where Mr. Jones was living?

A. Yes.

Q. Now, was Mr. Jones present when you and Mr. Madden were using drugs?

A. Yes.

Q. And what did Mr. Jones use?

A. Same thing.

Q. Okay. And were there times when Mr. Jones would share drugs with you?

A. Yes.

Q. And with Mr. Madden?

A. Yes.

\* \* \* \* \* \*

Q. How often would you see Mr. Madden at Mr. Jones's grandmother's house on Cottage Avenue during the fall of 1992?

A. Basically every day.

J.A. 100–102. It was immediately after this testimony, objection to which was properly made by Madden's counsel, that Burley recounted his conversation with Madden regarding the bank robbery.

In her closing arguments, the prosecutor referred six separate times to the fact that Madden abused drugs. In fact, the second sentence of her closing comments that related to Burley's testimony discussed this matter:

> Mr. Burley and Mr. Madden grew up together on Cottage Avenue, although Mr. Madden was somewhat older than Mr. Burley, but they'd known each other since 1980, or 1981. They both used drugs together. You remember Mr. Burley's testimony that they were using cocaine and heroin together.

> Mr. Burley told you they had robbed banks. He was seeking money for his drug habit, and I suggest to you that the evidence shows that Mr. Madden also was motivated to rob banks because he needed money for drugs as well.

J.A. 165. She then used the commonality of drugs to bolster her description of Burley's relationship to Madden:

> All of those details are specifics that only the bank robber would know, and I submit to you that Mr. Madden confided in his fellow drug user, Mr. Burley, and told him about the robbery.

J.A. 166. Finally, she drove this point home in the last moments of her closing argument:

> Mr. Madden was a friend of Mr. Burley's. They used drugs together. They shared drugs together. Mr. Madden would logically confide in Mr. Burley.

> \* \* \* \* \* \*

> Mr. Madden wouldn't confide in a person who didn't need a plea agreement. Mr. Madden confides in someone who he knows

is robbing banks and who's using drugs with him. . . .

J.A. 184.

## II.

On appeal, Madden challenges his conviction on two separate grounds. First, he asserts that the evidence to convict him was insufficient. Second, he asserts that Burley's testimony regarding Madden's drug usage violated Federal Rule of Evidence 404(b), and that his conviction must therefore be overturned. We consider each issue in turn.

## A.

■ "In reviewing the sufficiency of the evidence to support a conviction, the relevant question is whether, viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir.1989). We believe that Madden's challenge to the sufficiency of the evidence presented against him must fail. The robber left a demand note on the back of a memorandum from Madden's employer; Madden was one of two African–American employees absent from work that day, and his photo was picked out of a photographic lineup by the teller shortly thereafter. Burley testified that Madden had, for all intents and purposes, related a detailed account of the robbery, including a modus operandi that was precisely the one actually employed. Given the standard of review · for such a challenge, there can be no doubt that sufficient evidence was introduced to support Madden's conviction.

## B.

■ Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of such evidence it intends to introduce at trial.

In support of the admission of this evidence over Madden's objections, the government indicated that it intended to use the evidence of drug use to provide a motive to explain the robbery. Under this theory, Madden had a drug addiction, and while he had a paying, fulltime job, he needed to rob banks to support this addiction on the side.

The theory that underlies the introduction of evidence regarding drug use in a bank robbery prosecution is not that drug users are bad people and since this fellow is a drug user he certainly committed the crime with which he is charged; that is precisely the train of thought that Rule 404 prohibits. Instead, the theory under which such evidence is allowed arises from the idea that people rob banks to obtain money, and that they do so because of some financial need that they have. "Evidence that tends to show that a defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *United States v. Feldman*, 788 F.2d 544, 557 (9th Cir.1986) (internal quotation and citation omitted), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). Thus, the government understandably attempts to demonstrate some financial need to explain why the accused had a motive to do this illegal act; in some instances, the government will tie the need to some other illegal act that requires significant funds, at which point we are faced with a difficult balancing question between admissibility under Rule 404(b) and prejudice under Rule 403.

■ We fully agree with the obvious proposition that drug use or drug addiction may provide a logical motivation to commit bank robbery to generate the cash necessary to support the habit. Nevertheless, there are limits to this argument. Contrary to the implied suggestion in the government's position that *any* drug use should be admitted in a bank robbery prosecution, as pointed out

above it is not drug use *per se* that supports the underlying inference of financial need that makes the evidence relevant under Rule 401, but rather a demonstration by the government both that the accused has a significant drug habit or addiction and that he did not have the financial means to support it that makes such evidence of drug use relevant to establish a motive. Just as a need to buy a pocket radio would not be admitted to establish motive to commit bank robbery, so too we do not believe that evidence of occasional drug use should be admitted; financial need is the key element to establish motive.

This approach is in line with the reported decisions of the other circuits to which our attention has been drawn. In *United States v. Saniti*, 604 F.2d 603 (9th Cir.), *cert. denied*, 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979), Saniti was prosecuted for bank robbery and the government introduced evidence of Saniti's drug addiction, which was a heroin and morphine addiction at the level of $250 per day. In *United States v. Miranda*, 986 F.2d 1283 (9th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2393, 124 L.Ed.2d 295 (1993), the Ninth Circuit similarly admitted evidence of Miranda's heroin addiction, which required $20–$30 daily. In *United States v. Parker*, 549 F.2d 1217 (9th Cir.), *cert. denied*, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), the court allowed a motive argument after Parker introduced evidence that he had had a heroin habit for which he had sought treatment for ten years. All of this is in accord with the approach taken in *Feldman*, in which the defendant was charged with bank robbery and the government introduced evidence that he had overdrawn his bank account by $8,000 and was in financial need.

788 F.2d at 557. It is the financial need, not the particular act giving rise to the need, that establishes the relevancy to motive in a "financial crimes" prosecution.

■ In the present case, in contrast, the government introduced highly imprecise evidence of drug usage with no corresponding evidence of financial need. Both of these errors undermine the admissibility of this evidence under Rule 404(b). Burley's testimony was a model example of imprecision; although he indicated that he and Madden had used drugs, and that Madden had used heroin and cocaine, no other specifics can be gleaned from his testimony. In particular, there is absolutely no indication regarding the quantity and regularity of Madden's drug use.[2] While the testimony tars Madden as a drug user in the eyes of the jury, in violation of Rule 404(a), it does not offer a wisp of saving grace under Rule 404(b) by providing the evidence of significant drug usage that would allow a fact-finder to infer that such heavy use of drugs necessarily must require significant financial resources.

This error is compounded by the fact that there was no evidence submitted regarding financial need. Indeed, the government concedes that both Madden and his wife were gainfully employed throughout the period of time in question.[3] While the government argues on appeal that "[b]oth Madden and his wife were employed, and but for Madden's drug use, he would not have had an extraordinary need for cash which turned him to bank robbery," Br. of Appellee at 7, it brushes over the fact that it has failed to demonstrate either that Madden's drug use was significant or that whatever drug use there was created an "extraordinary need for

---

**2.** In the pretrial argument on this question, the government essentially conceded the weakness of its evidence of Madden's drug use:

THE COURT: What is the extent of his addiction?
MS. McDONALD: Well, Your Honor, the witness, who will testify, will testify that he and Mr. Madden were using drugs, and they used them together during the fall of '92.
THE COURT: Is there any evidence that he is a drug addict?
MS. McDONALD: Well, Your Honor, we don't have an expert witness qualified in diagnosing addiction who will testify.

THE COURT: Is he going to rehabilitation centers?
MS. McDONALD: Not that I'm aware of.
THE COURT: So the only testimony, then, would be that from time to time he used, or I don't know what, heroin.
MS. McDONALD: Heroin and cocaine.
J.A. 18–19.

**3.** In the pretrial argument on this matter, the government noted that "the defendant, and the evidence will show this, was employed, and his wife was employed at the time, and for, you know, a regular family, they had the means to pay their bills." J.A. 17.

cash." In fact, there is no evidence presented on appeal that suggests anything at all concerning the financial situation of Madden and his wife. While inferential leaps are the heart of indirect evidence, some chasms are simply too wide to bridge; in this instance, the inference that connects drug use to robbery is financial need, but no evidence was introduced to demonstrate such need, and we simply think it improper to make the *per se* assertion that all drug use provides a motive for bank robbery. While direct evidence of financial need will suffice, as will evidence of extensive drug use from which an inference of great expense may arise, evidence of neither is present in the instant case.

In *Huddleston v. United States,* 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988), the Supreme Court noted that "the threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." Thus, while 404(b) is viewed as an inclusionary rule, *United States v. Mark,* 943 F.2d 444, 447 (4th Cir.1991), evidence of prior bad acts is not admissible if it is introduced for the sole purpose of proving criminal disposition. *United States v. Russell,* 971 F.2d 1098 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). While in the proper case evidence of drug use creating financial need can explain the motive to commit a bank robbery and thus would clearly meet the test of Rule 404(b), we are persuaded that in this instance the government's evidence did no more than show that Madden was a drug user, which, absent evidence of financial need, is simply not relevant to a prosecution for bank robbery. We believe that the admission of this evidence was in error.

### C.

It remains for us to decide whether the error in the admission of this evidence of Madden's drug use requires us to vacate the conviction and remand for a new trial.[4] While we believe this a difficult case, in the end we are persuaded that the error was not harmless, and that a new trial is required.

█  Where error is founded on a violation of Rule 404(b), the test for harmlessness is "whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). This inquiry is not whether, absent the improperly admitted evidence, sufficient evidence existed to convict. *Id.* at 212. Rather than focusing particularly on the *quantum of evidence,* we are asked whether we can say that we believe it "highly probable that the error did not affect the judgment." *Id.* (quoting R. Traynor, *The Riddle of Harmless Error* 34–35 (1976)).

Burley's testimony established that Madden used drugs, namely heroin and cocaine. In the current climate, evidence that one is a drug user, brought before a jury in a big city ravaged by the deadly scourge of drugs and their attendant ills, is highly prejudicial, and we have no doubt that it is among the worst of crimes with which one can be tarred. *See United States v. D'Anjou,* 16 F.3d 604, 613 & n. 4 (4th Cir.1994). Even within the Rule 404 framework, with its requirement of Rule 403 balancing, *see United States v. Rawle,* 845 F.2d 1244, 1247 (4th Cir.1988), the prejudice of this evidence is great; in this instance, there is no countervailing probative value to redeem the evidence. Instead, it must be seen for what it was, evidence simply that Madden was a bad character engaged in using cocaine and heroin.

While the simple introduction of this evidence to the jury gives us pause, in this instance we must highlight the repeated, clear references to this matter in the prosecutor's closing statements, for it is the use of this evidence in the government's argument to the jury that creates the reversible harm. In those statements, six times the prosecutor

---

4. Madden urges the court simply to reverse the conviction; that is not the appropriate remedy in an instance in which error is predicated on a violation of one of the Federal Rules of Evidence. Instead, the question is whether retrial is necessary.

referred to Madden's drug use, noting that he "used drugs," J.A. 165, was a "drug user," J.A. 166, with a "drug habit," J.A. 165, who was "using cocaine and heroin," J.A. 165, and that "Mr. Madden confided in his fellow drug user, Mr. Burley," J.A. 166, with whom he was "shar[ing] drugs together." J.A. 184. With one exception, see J.A. 165 ("Mr. Madden also was motivated to rob banks because he needed money for drugs as well."), each time the prosecutor connected Madden with drugs, it had nothing to do with the question of motive under which this evidence was introduced; instead, the government repeatedly used Madden's alleged drug use impermissibly in portraying him before the jury as a bad person, a "drug user." In addition, this evidence was used not only to tar Madden, but also to bind him to Burley, the government's chief witness in the case, and the one whose testimony, while most important for the prosecution, was also the most perilous because of his plea bargain and his acknowledged personal drug use. Neither purpose is allowable under the Rules. We acknowledge that this argument was not the only one the government made to the jury, but the repeated, heavy emphasis placed on Madden's drug use when it had absolutely nothing to do with the matter charged prevents us from saying with fair assurance in this instance that the judgment was not substantially swayed by this impermissible argument.

We are therefore of the opinion that the conviction must be vacated, and that the case must be remanded for a new trial. In that trial, of course, the government is free to reintroduce evidence of drug use or financial need as laid out above; it simply cannot introduce vague evidence that Madden used drugs and expect the Rule 404(b) test to be met.

*VACATED AND REMANDED.*

WILKINS, Circuit Judge, dissenting:

I agree that the district court erred in permitting the Government to introduce evidence of Madden's drug use in violation of Federal Rule of Evidence 404(b). However, I cannot agree that the error requires reversal.

The majority correctly states that "[i]n the realm of nonconstitutional error, the appropriate test of harmlessness ... is whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). In applying this test, we must consider the other evidence presented demonstrating the defendant's guilt. *United States v. Davis,* 657 F.2d 637, 640 (4th Cir.1981). Indeed, the most important factor in the inquiry is the closeness of the case. *United States v. Urbanik,* 801 F.2d 692, 699 (4th Cir.1986). The examination into "closeness" involves assessing whether the other evidence is sufficiently powerful in relation to the tainted evidence to give "fair assurance" that the tainted evidence did not "substantially sway" the jury to its verdict. *Id.; United States v. Ince,* 21 F.3d 576, 584 (4th Cir.1994).

The majority discusses the evidence of Madden's drug use in detail, but fails to evaluate this tainted evidence against the overpowering evidence of Madden's guilt. Instead, the majority allows the prosecutor's references to drug use during closing argument to overshadow a review of the record as a whole. While there is a strong tendency to reverse when the error is clear and the Government's position is clearly wrong, we must review the record in light of "all that happened." *See United States v. Coades,* 549 F.2d 1303, 1306 (9th Cir.1977) (per curiam) (concluding that despite prosecutor's misuse of evidence of defendant's prior conviction, which amounted to "a deplorable example of prosecutorial overzealousness," the error by the trial court in admitting the evidence was harmless because the evidence of defendant's "guilt was so overwhelming that the error could not have affected the outcome").

This is not a close case. As detailed by the majority opinion, the evidence showing that Madden robbed the bank is overwhelming. The record provides more than "fair assurance" that the evidence of Madden's drug use did not "substantially sway" the

jury to its verdict. Therefore, the error of the district court in admitting this evidence was harmless. *See United States v. Grooms*, 2 F.3d 85, 89 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994) ("Given the one-sided nature of the evidence presented [when the only issue involved identity], we can say with fair assurance that the judgment was not substantially swayed by the trial court's error."); *Davis*, 657 F.2d at 640 ("[T]he evidence supporting [the defendant's] conviction was so conclusive that it is altogether unlikely that the error affected the verdict."). Accordingly, I respectfully dissent.