73 F.3d 359
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Nicholas James QUEEN, Defendant-Appellant.
 No. 94-5751.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 3, 1995.
Decided Dec. 21, 1995.
 
 ARGUED: Ellen Ross Finn, Supervising Attorney, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Jefferson McClure Gray, Assistant United States Attorney, Baltimore, Maryland, for Appellee. ON BRIEF: Steven H. Goldblatt, Director, Stephen J. Dietrich, Student Counsel, Lahela K. Hekekia, Student Counsel, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.
 Before MICHAEL and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Nicholas J. Queen was convicted of two counts of bank robbery by intimidation, two counts of armed bank robbery, and two counts of carrying a firearm during the commission of a crime of violence. He appeals his convictions, asserting that the district court abused its discretion in admitting evidence of his use and sale of illegal drugs before and after the robberies, and in instructing him to don a cap and sunglasses for in-court identifications by government witnesses. Finding no error, we affirm.
 
 
 2
 * This case arises out of a series of bank robberies in the Baltimore area between April 19, 1993 and June 2, 1993. In November, 1993, Queen was charged in an eight count indictment with the armed robberies of the Hamilton branch of Provident Savings Bank on April 19 and May 10, 1993, and the unarmed robbery of the Towson Market Place branch of Maryland National Bank on June 2, 1993. The district court granted Queen's motion to sever the June 2, 1993 robbery of Maryland National Bank from the two Provident robberies, and the government elected to try the two Provident (armed) robberies first.
 
 
 3
 During the trial on the Provident robberies, the government introduced testimony as to Queen's use and sale of illegal drugs, both to show that he had a motive to rob a bank (financial need), and to show that, subsequent to the robberies, he suddenly came into a large sum of money. Queen now appeals the admission of this evidence, claim ing that it "was not relevant to any issue in his trial for bank robbery," and that its probative value was substantially outweighed by the danger of unfair prejudice.
 
 
 4
 Under Fed.R.Evid. 404(b), evidence of other crimes or bad acts is not admissible to prove the character of the defendant, but may be admissible for other purposes, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. This circuit has interpreted Rule 404(b) to be an "inclusive rule," which "admits all evidence of other crimes (or acts) relevant to an issue in a trial except that which tends to prove only criminal disposition." United States v. Masters, 622 F.2d 83, 85 (4th Cir.1980) (internal quotations omitted). We follow a three step inquiry to determine whether evidence is properly admissible under Rule 404(b): evidence of "prior bad acts [is] admissible if [it is] (1) relevant to an issue other than character, (2) necessary, and (3) reliable." United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). See also United States v. Mark, 943 F.2d 444, 447 (4th Cir.1991). On appeal, we review a district court's admission of evidence under Rule 404(b) only for abuse of discretion. United States v. Mark, 943 F.2d at 447. Thus, a decision to admit evidence under Rule 404(b) will be overturned only if "arbitrary or irrational." United States v. Rawle, 845 F.2d at 1247.
 
 
 5
 In United States v. Madden, 38 F.3d 747, 752 (4th Cir.1994), we developed a specific inquiry to evaluate the admissibility of evidence of drug use to establish motive in a bank robbery prosecution. The government must demonstrate "both that the accused has a significant drug habit or addiction and that he did not have the financial means to support it." Id. In Madden, we held that the government had not sufficiently demonstrated the defendant's financial need to allow the admission of drug use evidence to establish motive. First, the testimony offered was very imprecise as to Madden's drug use; "there [was] absolutely no indication regarding the quantity and regularity of Madden's drug use." Id. Second, the government submitted no evidence concerning the "financial situation of Madden and his wife;" the only evidence in the record on the issue was, in fact, that both Madden and his wife were gainfully employed. Id. at 752-53.
 
 
 6
 In contrast, the government did introduce evidence of significant drug use by Queen. Mark Crandall, a co-defendant testifying pursuant to a plea agreement, testified that both he and Queen "had drug habits," that Queen was supporting both of their drug habits, that they spent at least a thousand dollars between April 20, 1993 and early May, 1993 on "girls and drugs," and that Queen went on a three day drug binge following the May 10 robbery. Queen's girlfriend, Okemia Epps, also testified that in April, 1993 she "was drawn towards Mr. Queen" because he was able to help support her two to three hundred dollar a day heroin and cocaine habits. This is clearly the type of evidence that "would allow a factfinder to infer that such heavy use of drugs necessarily must require significant financial resources." Madden, 38 F.3d at 752.
 
 
 7
 As to the second part of the Madden test, both Crandall and Epps testified that Queen was unemployed, and Crandall testified that when he and Queen had run out of money after the May 10 robbery, Queen directed Crandall to sell Queen's gun for $150 and five "dime bags" of crack cocaine. Queen's argument that in order to meet the financial need prong of Madden, the government has to eliminate all possible sources of income, such as selling drugs, or receiving money from family or friends, is meritless. Madden contains no such requirement. In this case, the government presented both direct evidence of financial need and "evidence of extensive drug use from which an inference of great expense will arise." See Madden, 38 F.3d at 753. Thus the testimony as to Queen's drug use and sales satisfied both prongs of the Madden test, and so was clearly relevant to his motive to rob banks.
 
 
 8
 The second requirement for admission of other crimes evidence is that it must be necessary. United States v. Mark, 943 F.2d at 447. Evidence is necessary "where it is an essential part of the crimes on trial, ... or where it furnishes part of the context of the crime." Id. at 448 (citations and internal quotations omitted). The evidence of Queen's drug use provides the context of the crime, showing both motive and Queen's relationship with Crandall, his co-defendant. See United States v. Boyd, 53 F.3d 631, 637 (4th Cir.), cert. denied, 116 S.Ct. 322 (1995) (Evidence of drug use by co-conspirators relevant to show the nature of their relationship; that the defendant trusted his coconspirator enough to use illegal drugs in front of him was "clearly probative of the close nature of their relationship," and thus, the likelihood that they were, in fact, co-conspirators.).
 
 
 9
 Finally, in order to be admitted under Rule 404(b), evidence of other crimes must be reliable. Mark, 943 F.2d at 447. In this context, reliability is not synonymous with credibility. United States v. Bailey, 990 F.2d 119, 123 (4th Cir.1993). Rather, such evidence should ordinarily be submitted to the factfinder, unless "so preposterous that it could not be believed by a rational and properly instructed juror." Id. It is then the job of the factfinder to determine the credibility of that evidence. United States v. Hernandez, 975 F.2d 1035, 1040-41 (4th Cir.1992). The evidence at issue here was certainly not "so preposterous" that it should not have been submitted to the jury at all. We have recognized that a cooperating witness' fear of subjecting himself to greater punishment by committing perjury is a factor supporting the reliability of "other acts" testimony. United States v. Bailey, 990 F.2d at 123. Additionally, Crandall's testimony was corroborated by Epps' testimony as to Queen's drug use, and by the testimony of Richard Fleig, who observed drugs and drug paraphernalia scattered about Queen's hotel room following Queen's three-day drug binge.
 
 
 10
 After it has been determined that evidence is admissible under Rule 404(b), the evidence must still be evaluated under Rule 403, and must be excluded if its probative value is substantially outweighed by the danger of undue prejudice. See United States v. Rawles, 845 F.2d at 1247. The evidence here was highly probative of Queen's motive to rob banks, and this probative value was not substantially outweighed by the danger of undue prejudice. Like all incriminating evidence, the drug use evidence was prejudicial, but it was not unfairly so. Furthermore, the district court gave appropriate limiting instructions to the jury during Crandall's testimony and during its final instructions. As we noted in Hernandez, "[t]he use of limiting instructions setting out the purpose for which the [Rule 404(b) ] evidence is admitted and admonishing the jury against considering it as improper evidence of guilt will do much to alleviate difficulties raised by its admission." 975 F.2d at 1039.
 
 II
 
 11
 Queen's remaining argument is that the district court abused its discretion in allowing the government to make him wear a baseball cap and sunglasses for in-court identifications during the testimony of three bank tellers.
 
 
 12
 In analyzing a defendant's claim that his due process rights were violated by an unreliable identification, we engage in a two step inquiry. See Neil v. Biggers, 409 U.S. 188, 196 (1972). First, we look to whether the identification procedure was unduly suggestive. Id. If so, we then determine whether the procedure was "nevertheless reliable under the totality of the circumstances." Id.; Holdren v. Legursky, 16 F.3d 57, 61 (4th Cir.), cert. denied, 115 S.Ct. 106 (1994). Factors relevant to reliability include, but are not limited to: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' attentiveness and degree of tension during the crime; (3) the accuracy of her prior descriptions of the robber; (4) her level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. Neil v. Biggers, 409 U.S. at 199-200. No one factor is dispositive. Because even an unduly suggestive identification procedure may nonetheless constitute no due process violation if the identifications are reliable, a court may, as we did in Holdren, proceed directly to the reliability of the identifications, without first evaluating the suggestiveness of the procedure.
 
 
 13
 A number of witnesses, many of them bank employees, identified Queen as the robber. The bank employees all observed Queen for at least five minutes in well lit business premises at a distance of five to fifteen feet. Five bank witnesses testified at trial. To assist three of them, Queen was asked to don a hat and glasses similar to those worn by the robber.
 
 
 14
 The first was Cheryl Mullhausen, the teller robbed in the first robbery, who was adjacent to the teller robbed in the second. She had failed to identify Queen's picture in a pretrial photo line-up and initially testified that she did not think she would recognize the robber if she saw him again, unless he was wearing the same thing he was wearing during the robbery. Once Queen donned a baseball cap and sunglasses, Ms. Mullhausen positively identified him. She explained that the hat and sunglasses made a difference because "that's how I know him as." Prior to trial, she had previously given a description of the robber that closely matched Queen's description and both prior to and during the trial, she positively identified Queen's voice on a voice array tape.
 
 
 15
 Zerita Johnson, the teller who was robbed in the second robbery, testified that, although she could not positively identify him, she believed the second photo in a photo array (Queen's photo) most closely resembled the "lead robber" in the May 10 robbery. She explained, "I only got a picture from the nose down because of the glasses and cap, so it was this part of the person that appeared to be the same." She then testified that she thought she would recognize the lead robber if she saw him again, "if he had on the same glasses and hats [sic]" Although she testified that the glasses and hat donned by Queen in court were not identical to those worn by the robber, she was able to positively identify Queen as the robber when he put on the hat and glasses in court. She explained that it made a difference "being able to see from the nose down, from the glasses, and the cap." She also listed Queen's "complexion, ... medium build, [and the area] around the nose" as other characteristics which helped her to make the in-court identification.
 
 
 16
 The third witness who relied on the glasses and cap to make an identification was the Bank Manager, Barbara Banack. Initially, Ms. Banack described the robber in her trial testimony and that description substantially matched Queen. She then testified that it might help her to determine whether Queen was the robber if he put on sunglasses and a hat, because "I saw him basically from the glasses down, the jaw line, and the lower portion of his face." When Queen put on those items, she stated "It looks like him with one exception," which was that she thought that the robber was "a little heavier." Queen had, in fact, lost weight during the year he spent in prison between the arrest and the trial. Ms. Banack approached Queen to examine his face, and testified that he had the same skin condition as the robber.
 
 
 17
 In addition to the three identifications aided by the glasses and hat, Assistant Bank Manager Donna Barrow positively identified Queen's photo in a photo array both prior to and during the trial. She also made a positive in-court identification without having Queen wear the hat and glasses. Teller Carla Moose rendered a description of the robber that matched Queen's, including a detailed description of a unique skin condition shared by Queen and the robber. She stated that she did not think she would recognize the robber if she saw him again, so Queen was not asked to put on the hat and glasses during her testimony. Finally, not only did Queen's co-defendant, Crandall, directly implicate Queen in the robberies; both Crandall and Queen's girl friend, Okemia Epps, identified Queen in the surveillance photos of the robberies.
 
 
 18
 Based on the totality of the circumstances, we believe the in-court identifications of Queen as the bank robber were reliable, even if the identification procedure was unduly suggestive. Thus, we cannot say that the district court abused its discretion in allowing the government to ask Queen to wear the hat and glasses during testimony of three witnesses.
 
 AFFIRMED