**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4738

TREADWAY LEVON MANNING,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CR-97-323)

Argued: September 24, 1999

Decided: October 3, 2000

Before MURNAGHAN* and NIEMEYER, Circuit Judges,
and Frank J. MAGILL, Senior Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Fletcher Nettles, IV, Assistant Federal Public
Defender, Florence, South Carolina, for Appellant. Thomas Ernest

_____
*Judge Murnaghan heard oral argument in this case but died prior to
the time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** J. Rene Josey, United States Attorney, Alfred W. Bethea, Jr., Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Treadway Manning was convicted of possession of a firearm by a felon, using and carrying a firearm during a crime of violence, and obstruction of commerce by armed robbery. The district court sentenced Manning as an armed career criminal to life imprisonment plus 60 months.

On appeal, Manning challenges (1) the justification for his arrest; (2) the sufficiency of evidence in support of his conviction for obstruction of commerce; and (3) his sentencing. For the reasons that follow, we affirm.

I

On January 14, 1997, Treadway Manning waited several hours outside of the Wheeler Street ABC liquor store in Marion, South Carolina, until it closed. After 72-year-old Paul Clark, an employee, closed the store at 7:00 p.m. and started walking towards his car, Manning approached Clark from behind and told him to "give it up." Clark turned towards Manning, said "don't shoot," and then pulled out a pistol and fired two shots at Manning. Neither shot hit Manning. Manning fired back and shot Clark in the stomach. As Manning fled the scene, the wounded Clark managed to fire two more shots in his

2

direction. Clark returned to the store and, when police arrived, told them he had been shot during an attempted robbery.

Two hours later, law enforcement agents stopped Manning in the general vicinity of the crime and frisked him for weapons. After finding nothing incriminating, they let him go.

The next day -- January 15, 1997 -- Manning and one of his associates, Michael Covington, robbed Papa Tom's fast food restaurant in Dillon, South Carolina. During this robbery, Manning allegedly shot and killed Wayne Caulder, a restaurant employee.

Several days later, Manning visited the police station to ask whether he was "wanted" for anything. Although this visit appeared suspicious to police, they told Manning that they were not looking for him at that time. A series of events unfolded thereafter, however, that led the police to begin an investigation of Manning.

Manning's accomplice in the Papa Tom's robbery, Michael Covington, agreed to speak with police, telling Officer Campbell while riding to the police station that he and Manning had robbed Papa Tom's and that in the course of the robbery Manning had murdered a store employee. After arriving at the police station, Covington told another officer a conflicting story, stating that Richard Moore, not Manning, shot Caulder at Papa Tom's. Following further questioning, however, Covington retracted this story about Moore and confirmed his earlier statement that he and Manning were the actual perpetrators. Covington described the Papa Tom's robbery in some detail, explaining that he and Manning wore black leather jackets and ski masks, that they had jumped over the counter, that three shots were fired, that Caulder was shot in the back, and that Caulder fell in a particular place. Covington also described the money bags used in the robbery. Acting on Covington's information, the police obtained a warrant for Manning's arrest.

On January 24, 1997, police went to the residence of Manning's sister, where Manning took refuge after his attempted robbery of the Wheeler Street ABC liquor store, and Manning's sister told police that Manning normally carried a firearm, that he stole things, and that he had told her that he recently killed a white man during a robbery

3

in Marion where the liquor store was located. That same morning, police also went to the house of Manning's girlfriend, where Manning was known to live, and waited for Manning to leave the house. When Manning and his girlfriend did leave later that morning and began driving towards Dillon, South Carolina, the police stopped the car, arrested Manning, and seized suspected cocaine from his shirt pocket, along with a loaded handgun from his back pocket. Manning waived his Miranda rights and confessed to shooting Paul Clark during the attempted robbery of the Wheeler Street ABC liquor store on January 14.

The government charged Manning in six counts for (1) possession on January 14 of a firearm by a felon during the Wheeler Street ABC liquor store robbery, in violation of 18 U.S.C.§ 922(g); (2) using and carrying a firearm on January 14 in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); (3) obstructing commerce on January 14 by an attempted armed robbery, in violation of 18 U.S.C. § 1951; (4) possession of a firearm by a felon at the time of his arrest on January 24, in violation of 18 U.S.C. § 922(g); (5) using and carrying a firearm on January 24 in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and (6) possession on January 24 of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The government later dismissed counts 5 and 6, and the jury convicted Manning of the remaining four counts.

The district court sentenced Manning as an armed career criminal to life imprisonment plus 60 months. Manning filed a timely notice of appeal, challenging (1) the probable cause for his arrest; (2) the sufficiency of the evidence supporting his conviction on Count 3 for obstructing commerce by attempted armed robbery; and (3) various aspects of his sentencing.

II

Manning contends first that the warrant for his arrest lacked probable cause because the police officers concealed exculpatory evidence from the issuing magistrate judge when obtaining the warrant. According to Manning, the police did not tell the magistrate judge about exculpatory aspects of Michael Covington's statement to police in which Covington initially identified someone other than Manning

4

as the Papa Tom's murderer. Manning also maintains that the waitresses at Papa Tom's described the robbery in terms that differed from Covington's account.

While Manning identifies some discrepancies in Covington's account of the Papa Tom's robbery and murder, there was ample independent evidence corroborating the account finally given by Covington to justify reliance on the information to obtain an arrest warrant. See Illinois v. Gates, 462 U.S. 213, 233 (1983) (holding that an informant's "reliability" and "basis of knowledge" are two relevant factors in the probable cause calculus, but that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability"). To begin with, Covington's statement was effectively a confession to the Papa Tom's robbery, implicating himself along with Manning. Because Covington's statement involved self-incriminating admissions of a crime, for that reason alone it had some inherent guarantee of reliability. See United States v. Harris, 403 U.S. 573, 583 (1971) (plurality opinion). The fact that Covington identified someone other than Manning during a brief period of his interrogation may be discounted in the face of his ultimate confirmation that Manning was indeed the perpetrator because Covington could not implicate Manning without implicating himself. It was thus understandable that Covington would initially try to place blame elsewhere.

Furthermore, the Papa Tom's waitresses corroborated Covington's description of the robbery in many crucial respects. Despite the minor discrepancies (on the number of gunshots -- two versus three -- and the heights of the robbers), Covington and the waitresses all said that Manning jumped over the counter after entering the restaurant, that the robbers wore black leather jackets and ski masks, and that one money bag contained green currency and another money bag contained change. Also, the police were able to corroborate Covington's statement that Caulder was shot in the back, as well as Covington's placement of where Caulder's body lay after the shooting.

In short, although Manning has pointed to a few minor discrepancies in Covington's account, he has failed to address the corroborated information that provided probable cause for Manning's arrest.

5

III

Manning next challenges the sufficiency of evidence in support of his conviction on Count 3 for obstructing commerce by attempted armed robbery, in violation of 18 U.S.C. § 1951 (the Hobbs Act). That Act provides in relevant part: "Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery . . . or attempts or conspires so to do, or commits or threatens physical violence to any person . . . in furtherance of a plan or purpose to do anything in violation of this section shall be" punished. Manning argues that the evidence shows that he attempted to rob only Paul Clark <u>as a private individual</u>, not in his capacity as an employee of the liquor store. Manning concedes "that a robbery of this liquor store could affect interstate commerce" in satisfaction of the jurisdictional requirements of the Hobbs Act. <u>See United States v. Bailey</u>, 990 F.2d 119, 125 (4th Cir. 1993) (holding that the jurisdictional provisions of the Hobbs Act may be satisfied by threatened effects on commerce that are small).

At trial, Officer Sam Parker testified that when talking with Manning about the Papa Tom's robbery and murder, "Mr. Manning wanted to talk to me about <u>the robbery of a Marion A.B.C. store</u>" (emphasis added). Officer Parker then related how Manning wrote out a statement on his own, confessing to the robbery as follows:

> On January 14, 1997, approximately 7:45 p.m., I, Treadway Manning, waited around the building until the A.B.C. clerk came out. Once he locked the doors and started toward the car, I approached him from behind and told him to give it up. . . . When I told him to give it up, I meant the money.

From this evidence, the jury could properly have inferred that Manning waited for the store to close with the idea of obtaining <u>the store's</u> revenues that Manning believed Paul Clark would be carrying. By waiting for the store to close, the jury could infer that Manning was trying to avoid robbing the store while it was still open to avoid risking the triggering of alarms and his identification by cameras. This inference is corroborated by Manning's initial statement to Officer Parker that he wanted to talk about "the robbery of a Marion A.B.C. store." Thus, although Manning's immediate victim was an individual, it would have been reasonable for the jury to conclude that his

6

ultimate target was the liquor store's revenues being carried by that store's employee. And, as Manning concedes, this potential effect on the liquor store's commerce provides a sufficient effect on commerce to satisfy the Hobbs Act's requirements. See Bailey, 90 F.2d at 125.

IV

Finally, Manning challenges his sentencing, contending: (1) that two of four prior convictions did not constitute predicate offenses for the sentencing enhancement provision of the armed career criminal statute, 18 U.S.C. § 924(e); (2) that the district court abused its discretion in departing upwards based on the extreme psychological injury to the victim of the Wheeler Street liquor store robbery; and (3) that the district court abused its discretion in departing upwards based on its belief that Manning's criminal history score underrepresented the seriousness of his criminal history or the likelihood that he would commit further crimes. We address these contentions seriatim.

A

Section 924(e) of Title 18 authorizes enhanced punishment of a person convicted of a § 922(g) offense (possession of a firearm by a felon) if that person is also an armed career criminal -- one who has three previous convictions for a "violent felony" or a "serious drug offense." A "serious drug offense" is defined to include any offense under state law involving possession with intent to distribute a controlled substance, "for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A). A "violent felony" is defined as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another" or that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).

In this case, the district court found that Manning's prior convictions for (1) resisting arrest, (2) burglary, (3) possession with intent to distribute drugs, and (4) failure to stop for a police signal were qualifying predicate convictions under 18 U.S.C. § 924(e). Manning concedes that the resisting arrest and burglary convictions were proper predicate convictions under the statute. He maintains, however, that neither his conviction for distributing drugs nor his convic-

7

tion for failing to stop for a police signal satisfied the armed career criminal statute. We disagree.

Manning's prior conviction for distributing drugs was a state conviction of possession of marijuana with intent to distribute, a conviction that was obtained after Manning had earlier been convicted for possession of marijuana. Under South Carolina law, a person guilty of possession with intent to distribute may be imprisoned not more than five years for a first offense nor more than ten years for a second or subsequent offense. See S.C. Code Ann.§ 44-53-370(b)(2). When Manning pled guilty to this second drug offense in South Carolina, the presiding judge advised him that the maximum sentence was five years, somehow failing to recognize that this offense was Manning's second. Because Manning only received a sentence of four years, he contends that his second offense was treated as a first offense and that the conviction therefore did not meet the federal law's ten-year minimum requirement. See 18 U.S.C. § 924(e)(2)(A)(ii).

In applying the armed career criminal statute, however, we utilize a formal categorical approach, looking only to the statutory definition of the predicate offense and not to the particular circumstances underlying the conviction. See United States v. Taylor, 495 U.S. 575, 600-01 (1990); United States v. Coleman, 158 F.3d 199, 201-02 (4th Cir. 1998) (en banc). Thus, regardless of how the state judge sentenced Manning, at the time he pled guilty to the drug distribution offense, he had a prior conviction and therefore was subject to the statutory maximum of 10 years.

In addition to the drug distribution charge, Manning had a prior conviction for failure to stop for an officer's blue light. While Manning was driving a vehicle, which had been reported as stolen, Dillon police officers followed, attempting to initiate a traffic stop by activating the police vehicle's siren and blue lights. Manning, however, refused to stop. When he finally did stop, he exited the vehicle and fled on foot several blocks before he was arrested. Although Manning's failure to stop did not actually result in any physical injury, the potential for injury is determinative for armed career offender status. In United States v. Hairston, 71 F.3d 115 (4th Cir. 1995), which involved the offense of escape, we established the test for evaluating whether a particular criminal offense is a violent felony that presents

8

a risk of injury to others for purposes of 18 U.S.C.§ 924(e). The question, we held, is "determined by a categorical approach, whereby the court looks only to the fact of conviction and the statutory definition of the offense, and not to the underlying facts of a specific conviction." Id. at 117. Under this approach, a court must make "common sense judgments about whether a given offense proscribed generic conduct with the potential for serious physical injury to another." Id. (citations and internal quotation marks omitted); see also Taylor, 495 U.S. at 597-98 (interpreting violent felony category to include "run-of-the-mill burglaries involving . . . no use or threat of force" because "Congress thought ordinary burglaries . . . presented a sufficiently `serious potential risk' to count towards enhancement"); United States v. Mobley, 40 F.3d 688, 696 (4th Cir. 1994) (holding that pickpocketing is a "violent felony" because "whenever pickpocketing fails and the criminal is detected, a confrontation is likely, and the stealthy pickpocketing can progress into something far uglier").

Manning does not challenge the validity of this categorical approach for qualifying prior offenses. Instead, he argues that the failure to stop for a police signal is not inherently confrontational, given that many drivers who fail to stop no doubt do so for innocuous rather than belligerent reasons. This argument, however, ignores the potential violence that could result from the failure to stop and the confrontation thereafter that could occur between the police and the driver. This potential is analogous to the violent potential presented by the act of escaping from prison, see Hairston, 71 F.3d at 117; the act of burglaring, see Taylor, 495 U.S. at 597-98; or the act of pickpocketing, see Mobley, 158 F.3d at 203-04.

Accordingly, we agree with the district court that it could consider both of these prior offenses in determining whether Manning was an armed career criminal.

B

Manning next challenges the district court's upward departure based on the extreme psychological injury that Manning inflicted on Clark during the attempted robbery of the liquor store. The sentencing guidelines permit upward departures where the victim of a crime suffers "psychological injury much more serious than normally resulting

9

from the commission of the offense." U.S.S.G.§ 5K2.3. We review this sentencing decision for an abuse of discretion. See United States v. Barber, 119 F.3d 276, 282-83 (4th Cir. 1996) (en banc).

In the case before us, Clark never returned to work after he was shot in the stomach for fear that he might be shot again. He suffered nightmares and other sleeping problems and had to be placed on medication. According to family members, Clark underwent a significant personality change after the attack. He became frightened and withdrawn, and his family was seeking professional counseling prior to his death to help him deal with the emotional anxiety. In these circumstances, we are satisfied that the district court did not abuse its discretion in departing upward for Clark's extreme psychological injury.

C

Finally, Manning challenges the district court's upward departure based on the underrepresentation of Manning's criminal history or the likelihood that he will commit other crimes in the future. See U.S.S.G. § 4A1.3.

In the instant case, the presentence report indicates that Manning began his criminal career at age 13 and remained in the criminal justice system for virtually all of the next 13 years, until the crimes before us were committed. He had no employment history and no apparent means of income, other than through crime. Manning received 12 criminal history points based on a selective and incomplete sampling of the numerous crimes he had committed since his youth. These 12 points, together with his armed career criminal status, placed Manning in criminal history category VI. But this category failed to represent Manning's long list of juvenile convictions and his repeated violations of his probation and parole, not to speak of the seriousness of the crimes for which he has not yet been convicted, namely, the murder at Papa Tom's restaurant and the assault at the liquor store. We cannot say that the district court clearly erred in finding that notwithstanding the armed career criminal enhancement, Manning's criminal history score underrepresented the seriousness of his criminal record and the likelihood that he would commit further

crimes. Accordingly, it was not an abuse of discretion for the district court to depart upward on this ground.

For the foregoing reasons, Manning's judgment of conviction is

AFFIRMED.

11